David E. ELLIOTT, Jr., an incapacitated adult, By and Through his guardian, Barbara V. ELLIOTT; and Barbara V. Elliott, Individually, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 91–55–COL.

United States District Court,
M.D. Georgia,
Columbus Division.

Nov. 10, 1992.

C. Neal Pope and Paul V. Kilpatrick, Jr. of Pope, McGlamary, Kilpatrick & Morrison, Columbus, GA, for plaintiffs.

H. Randolph Aderhold, Jr., Asst. U.S. Atty., Macon, GA, for defendant.

## *OPINION*

ELLIOTT, District Judge.

This action arises under the Federal Tort Claims Act and trial was had in June, 1992. The parties have filed their post-trial submissions and the Court, in compliance of the requirements of the Federal Rules of Civil Procedure, now files this opinion in which the Court's findings of fact and conclusions of law will be readily apparent.

The Plaintiffs have complied with all of the prerequisites for the institution of this action and the Court has jurisdiction over the parties and the subject matter and venue is properly laid in this court.

The complaint is based upon Georgia law governing landlord liability and is brought by Plaintiffs David E. Elliott, Jr. (David Elliott), by and through his guardian, Barbara V. Elliott, and Barbara V. Elliott (Barbara Elliott), individually, against the United States of America, the government agency here involved being the Department of the Army (hereinafter sometimes called "Defendant"). Plaintiffs are husband and wife and they seek recovery for profound and debilitating lifetime injuries, medical expenses, loss of earnings, loss of earning capacity, pain and suffering, loss of enjoyment of life, loss of consortium and all other damages available un-

der Georgia law arising from carbon monoxide poisoning they suffered in their apartment at Upatoi Terrace, Fort Benning, Georgia, on August 28 and 29, 1989. At the time of the injuries David Elliott was a member of the United States Army and Barbara Elliott was a civil service employee.

The Plaintiffs contend that as a direct result of a defective flue pipe attached to the hot water heater in their apartment carbon monoxide gas was discharged into the apartment and caused them to lose consciousness and suffer carbon monoxide poisoning and other severe physical injuries and other damages. Plaintiffs further contend that the defective condition of the hot water heater venting system was latent, unknown to Plaintiffs and not reasonably ascertainable by Plaintiffs in the exercise of ordinary care during their occupancy of the subject quarters; that Defendant had a duty to inspect, maintain, service and keep in good repair the apartment owned by it and furnished to Plaintiffs for their occupancy; that the Defendant breached this duty by failing to properly inspect, maintain, service and repair the hot water heater flue pipe. Plaintiffs also contend that Defendant did not turn over the residential quarters in a safe condition for use by Plaintiffs as a residence; that Defendant had a duty of reasonable care and is responsible to Plaintiffs for damages resulting from the defective construction of or from failure to keep the quarters in good repair; and that Defendant violated building codes and Army regulations in installing and maintaining a defective single wall vent pipe in the quarters. They contend that Defendant breached the aforesaid duties and is therefore guilty of negligence and negligence per se, and that said conduct by the Defendant was a direct and proximate cause of Plaintiffs' injuries and damages.

Plaintiffs contend that Defendant maintained qualified possession and control of the quarters for purposes of inspection, maintenance, service and repair; that Defendant by and through its agents and employees did from time to time, prior to the occurrence made the basis of this lawsuit, enter the quarters for the purposes of inspection, maintenance, service and repair; and that Defendant knew, or in the exercise of reasonable care, should have known, of the latent, dangerously defective condition of the premises and hot water heater venting system.

Plaintiff David Elliott was a member of the United States Army with the rank and classification of SSG (E–6) and was stationed at Fort Benning, Georgia, a United States Military Reservation. On August 28 and 29, 1989, he was on ordinary leave status and was assigned to government quarters, namely an apartment at 906–C O'Brien Circle, Fort Benning, Georgia, and he and has wife Barbara Elliott resided together in the quarters. The apartment, as furnished by the Defendant to Plaintiffs, had a 40–gallon A.O. Smith natural gas fired water heater that was vented with a three-inch flue pipe. The quarters are owned, maintained, repaired, inspected, serviced by and under the control of the Defendant and were constructed during 1951 and 1952. Defendant had employees to maintain and repair the quarters and by and through its agents and employees, did, from time to time prior to the occurrence made the basis of this lawsuit, enter the quarters for the purposes of inspection, maintenance, service and repair. The Defendant's agents and/or employees entered the apartment located at 906–C O'Brien Circle, prior to August 29, 1989, for the purposes of inspection, maintenance, service or repair and the Defendant retained the right to enter the apartment for purposes of inspection, maintenance, service and repair. Under Georgia law the Defendant is subject to a statutory duty as a landlord.

On Monday, August 28, 1989, Barbara Elliott went to work at the Finance and Accounting Office at Fort Benning. David Elliott was still on ordinary leave and was not to report for duty until the morning of August 30, 1989. His duty status was "absent with authority" and "on leave" at the time of this incident. Barbara Elliott worked a full day on August 28 and returned home about 5:00 P.M. that afternoon. Later that evening she felt nauseated and went to bed early. David Elliott stayed up and watched television while seated on a sofa in the living room.

The air conditioning unit in the apartment was not working and the Elliotts were utiliz-

ing for cooling purposes a window fan which had been put on the floor of the living room. Neither the stove nor the furnace in the apartment was turned on that night.

The next morning, August 29, Barbara Elliott was scheduled to be at work at 7:45 A.M. and when she did not report for work her supervisor became concerned. A telephone call to the apartment was unanswered and about 10:30 A.M. he drove to the Elliott's house, noticed that both cars were there, the doors were locked and windows were closed, but no one responded to repeated knocks on the door. He called Elliott's military unit and learned that Elliott was on leave. He became so concerned that he called the military police who came and took over the situation. After several attempts to obtain some response from inside the apartment the military police broke into the apartment and found Barbara Elliott on the bed and David Elliott on the sofa, both unconscious but still breathing. A military ambulance was dispatched and both of them were transported to the Martin Army Community Hospital where they were admitted to the intensive care unit in critical condition as the result of what was later determined to be carbon monoxide poisoning.

A number of government civil service employees testified in the trial of this case as to their individual observations made on August 29 and thereafter concerning the condition of the water heater and the vent stack and the sources of the carbon monoxide which poisoned David and Barbara Elliott. An industrial hygienist at Martin Army Community Hospital checked the levels of carbon monoxide in the apartment and found that about two hours after the Elliotts had been removed and the doors had been open there was still a high level of carbon monoxide in the apartment. He observed that the vent stack to the water heater had holes in it and he gave it as his opinion that the source of the problem was the water heater and the deteriorated vent pipe. A lieutenant in the Fort Benning Fire Department whose unit was called to the scene testified that when he arrived the water heater was functioning and he noted that the vent pipe above the water heater was in what he described as "bad

shape." He noted several places where the pipe had rusted through and when the Fire Chief arrived and placed his hand on the vent pipe he poked his finger all the way through the pipe. The Assistant Fire Chief found the pipe to be "rotten and a hazard in terms of emitting gases into the apartment." The extension of the vent pipe in the attic was sagging and in a "U" shape instead of an appropriate 45 degree angle and lacked about three inches being connected to the roof jack. This situation meant that the drafting and elimination of gases from the water heater, including carbon monoxide, would be substantially reduced thereby increasing the escape of gases into the apartment below.

The other appliances in the apartment which used natural gas, the stove and furnace, were checked and no other leaks were present.

The Defendant concedes that David and Barbara Elliott suffered carbon monoxide poisoning while in their residence on August 28 and 29, and it is the Court's view that the evidence clearly establishes beyond doubt that the only possible source of carbon monoxide was the gas fired water heater in the residence. No witness speculated as to any source of carbon monoxide in the residence other than the water heater and vent pipe.

The applicable regulations and standards associated with the installation of gas water heaters and vent pipes—ANSI, NFPA 211—1977 (Plaintiff's Exhibit 18) and NFPA 54, ANSI 223.1 (Plaintiff's Exhibit 19)—prohibit the use of single wall vent pipes through an attic. An old water heater was replaced in this apartment in 1985 and these standards would have required the Defendant to replace this single wall vent pipe when the water heater (in place at the time of the Elliotts' injuries) was installed. The Defendant never replaced or repaired this vent pipe.

Succinctly stated, the Court finds:

That the carbon monoxide which caused the injury to the Plaintiffs escaped into the apartment as a result of the defective, deteriorated water heater vent pipe;

That the vent pipe was in the faulty condition for several years prior to this incident and was in that hazardous state at the time the residential quarters were furnished by the Defendant to the Plaintiffs as a residence;

That the vent pipe was a single wall pipe from top to bottom from its connection to the water heater through the ceiling, through the attic, and up to a point below the roof jack;

That in allowing this single wall vent pipe to pass through the attic was a violation of the Defendant's own regulations and standards and the NFPA and ANSI standards which its employees acknowledged should have been complied with;

That the Defendant had a duty to replace this single wall vent pipe when the water heater was replaced in 1985 as required by the applicable regulations and that the Defendant breached this duty and that this negligence on the part of the Defendant was a proximate cause of the carbon monoxide poisoning of the Plaintiffs;

That had the Defendant replaced the vent pipe this incident would not have occurred;

That had the Defendant inspected the vent pipe upon replacement of the water heater in 1985 the Defendant would have or should have found that the vent pipe was corroded, had holes in it, and was unsafe for use;

That having had notice of the defective vent pipe the Defendant then had a duty to replace the pipe and a breach of that duty constituted negligence on the part of the Defendant which was a proximate cause of the injury to the Plaintiffs;

That the vent pipe was sagging in the attic in a "U" shape configuration which reduced the drafting and elimination of combustion gases such as carbon monoxide from the water heater and that had the Defendant replaced the faulty vent pipe at the heater connection and installed double walled vent pipe as was its duty to do under the Code of Regulations this incident would not have occurred;

That, in summary, the Defendant breached its statutory, regulatory, and common law duties to the Plaintiffs to provide safe, non-hazardous residential premises and as a proximate result the Plaintiffs suffered injury and damages.

The Court further finds that there was no negligence on the part of the Plaintiffs which contributed in any way to this occurrence.

In the answer which it filed to Plaintiffs' complaint in this case the Defendant admitted that it is subject to a statutory duty as a landlord as provided by Georgia law. Section 44-7-13 of the Georgia Code provides that "the landlord must keep the premises in repair" and Section 44-7-14 provides that "the landlord is responsible for damages arising from defective construction or for damages arising from the failure to keep the premises in repair."

■ This case involves a latent defect in the vent pipe to the water heater and the Defendant did not fully part with possession or control over the premises and retained the specific right to inspect, maintain, repair, service and enter upon the premises, and decisions of the Georgia appellate courts for many years have made it clear that Georgia law requires a landlord who maintains such qualified possession to be liable for injuries resulting from any defects of which the landlord had or could have had knowledge and failed to disclose them to the tenant. *Black v. New Holland Baptist Church, et al.,* 122 Ga.App. 606, 178 S.E.2d 571 (1970); *Powell v. United Oil Corp., et al.,* 160 Ga.App. 810, 287 S.E.2d 667 (1982).

There is no question that these duties which are imposed by Georgia law on a landlord are applicable in this case because the Defendant did not fully part with possession or control over the premises and therefore assumed the duty of repair, inspection, maintenance, and service of the premises and breached its duty to provide safe and non-hazardous premises to the Plaintiffs.

■ The Court further finds that under the circumstances of this case and entirely apart from any statutory provisions the Defendant was under a duty to exercise ordinary care in its inspection, service, maintenance, or repair of the premises and that it failed to do so and that such failure on the part of the Defendant proximately caused the

injuries and damages sustained by the Plaintiffs.

Defendant has asserted that Plaintiff, David Elliott, is barred from recovering in this action under the "activity incident to service" doctrine of *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and its progeny, and has further asserted that the claims of Barbara Elliott which are derivative of David Elliott's claims are likewise barred. Defendant argues that the instant case fits within the exception to the United States waiver of sovereign immunity created in *Feres.*

■ In ascertaining whether *Feres* bars an action brought by a serviceman under the Federal Tort Claims Act, the Court must consider whether the injuries arise out of or are in the course of *activity* which is "incident to service." *Feres,* 340 U.S. at 146, 71 S.Ct. at 159. What "incident to service" means is best understood by examining the language employed by the Supreme Court in creating the *Feres* exception. Responding to the argument that the rationales underlying the *Feres* doctrine were present, before the Supreme Court and rejected in *Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), wherein the Court permitted the injured serviceman to recover, the *Feres* Court stated:

> The actual holding in the *Brooks* case can support liability here only by ignoring the vital distinction there stated. The injury to Brooks did not arise out of or in the course of military duty. Brooks was on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission. A government owned and operated vehicle collided with him. Brooks' father, riding in the same car, recovered for his injuries and the government did not further contest the judgment but contended that there could be no liability to the sons, solely because they were in the Army. This Court rejected the contention, primarily because Brooks' relationship while on leave was not analogous to that of a soldier injured while performing duties under orders.

*Feres,* 340 U.S. at 146, 71 S.Ct. at 159.

Clearly, for an injury to be deemed as "incident to service," that injury must be sustained "while performing duties under orders." There is no controversy concerning the facts material to a determination of this issue. On August 28 and 29, 1989, the dates of the occurrence made the basis of this action, clearly not during time of war, David Elliott, while a member of the United States Army was on that date and for some time prior thereto on ordinary leave status. The government itself determined his duty status to be "absent with authority." He was assigned to government quarters and he and his wife, Barbara Elliott, resided together in these quarters. These quarters are owned, maintained, repaired, inspected, serviced by and under the control of the Department of the Army, and the Department of the Army has a duty to maintain these premises in a safe and habitable condition. On August 28 and 29, 1989, David Elliott and his wife sustained severely disabling injuries as the result of carbon monoxide poisoning, this being caused by a faulty venting system which was attached to the water heater in their apartment.

In *Parker v. United States,* 611 F.2d 1007, 1013 (5th Cir.1980), the serviceman left his duty station at the end of the day on August 28, 1974. He had requested leave and received permission to be absent from his duty station until Monday morning, September 2, 1974. The panel set out the facts giving rise to Parker's death as follows:

> [W]hile Parker was on his way home on this leave, a serviceman named Peters drove a military vehicle across the centerline and collided head-on with Parker's vehicle in Parker's lane of traffic. Parker died a short time later from injuries he received. Parker was driving a car borrowed from a civilian. The collision occurred on West Range Road, an army maintained road within Fort Hood. The Government contends that Parker was wearing his military fatigues, while appellant states that she cannot admit or deny that. Parker's family is receiving veterans benefits.

*Parker,* 611 F.2d at 1008 (footnote omitted).

The panel observed that, under these facts and absent the "glosses emanating from this

judicial exception" (the *Feres* doctrine), "common sense and a functional approach to the problem might dictate that one driving towards his home after work in a private car is doing nothing 'incident to military service'...." *Id.* at 1009. Despite these "glosses emanating" from the various cases interpreting and construing *Feres,* the panel observed that one point emerges as a caution to those seeking to find meaning in the phrase "incident to service."

> The test is not a purely causal one: one cannot merely state that but for the individual's military service, the injury would not have occurred.... Therefore, it is insufficient to aver that but for Parker's military service, he would not have been at the scene of the collision. In some cosmic sense 'all human events depend upon what has already transpired.'

*Parker,* 611 F.2d at 1011, quoting *Brooks v. United States,* 337 U.S. at 52, 69 S.Ct. at 920 (other citations omitted). "More is needed for the activity to be 'incident to military service.'" *Parker,* 611 F.2d at 1011. To resolve the issue in *Parker,* the panel analyzed the three factual indicia identified above: (1) the duty status of the plaintiff; (2) the location of the accident; and (3) the activity the member was performing at the time of the injury.

As to duty status, the panel noted that between the extreme of an individual who has been discharged from service and whose injuries are therefore not "incident to service" and one who is on active duty, who is on duty that day and whose injuries are therefore "incident to service" are "degrees of active duty status ranging from furlough or leave to mere release from the day's chores. One on furlough or leave, as in *Brooks,* normally has an FTCA action." *Parker,* 611 F.2d at 1013. *See also, Harvey v. United States,* 884 F.2d 857, 859 (5th Cir.1988) (duty status is usually considered the most important of the three factors).[1] The panel in *Parker* next examined the location of the incident giving rise to the injuries. Like David Elliott's injuries in the instant case, Parker's injuries occurred on the reservation.

The panel stated: "the occurrence of an on-the-reservation injury, however, does not immediately trigger application of *Feres.* If the injury occurred on the base, the Court must proceed to the further inquiry of what function the soldier was performing at the time of the injury in order to ascertain the totality of circumstances." *Parker,* 611 F.2d at 1014. *See also, Brown v. United States,* 99 F.Supp. 685 (S.D.W.Va.1951) (serviceman injured in a swimming pool on the base not barred by the *Feres* doctrine). The panel observed that "where the injury occurred should not be emphasized above all other factors." *Id. See also, Hand v. United States,* 260 F.Supp. 38 (M.D.Ga.1966) (accident occurred on highway traversing Fort Benning; claim not barred by *Feres* doctrine). The *Parker* panel concluded:

> Rote application of a "baseline" rule which would allow recovery in those cases [where the injuries were sustained en route to but prior to reaching the base] but deny it in a *Parker* situation is illogical and abrogates the responsibility to look at all the circumstances to see if the activity was "incident to service." Once it is determined that the service members' duty status might warrant allowing the action but that the injury occurred on the base, the court should go further and inquire into precisely what the person was doing when injured.

*Parker,* 611 F.2d at 1014. *See also, United States v. Shearer,* 473 U.S. 52, 57, 105 S.Ct. 3039, 3042, 87 L.Ed.2d 38 (1985) ("The *Feres* doctrine cannot be reduced to a few bright-line rules; each case must be examined in light of the statute as it has been construed in *Feres* and subsequent cases.").

With respect to the third factor—the activity in which the injured serviceman was engaged when the injuries occurred—the Court of Appeals in *Parker* observed that Parker was merely passing through the base on his way home. Elaborating on the significance of this act, the Court stated: "Parker was not directly subject to military control; he was not under the compulsion of military orders; he has not performing any military mission." *Parker,* 611 F.2d at 1014. *See*

---

1. Defendant in the LOD investigation arising from the Elliotts' injuries, determined David El- liott's duty status to be "absent with authority" and "on leave."

*also, Hand,* 260 F.Supp. at 41 (At the time he was killed, Hand "was not ordered to go on the bird hunt. He was not performing any military mission. He was not discharging any military duty."). In both *Parker* and *Hand,* the respective Courts ruled that an individual involved in activity so totally detached from military control, military duties and any military mission could not be deemed to have been injured "incident to service."

The decision of the Court of Appeals in *Parker v. United States* requires a District Court, in making a determination whether injuries sustained are incident to military service, to consider:

1. The duty status of the Plaintiff;

2. The location of the accident; and

3. The activity the member was performing at the time of the injury;

it being stated that the Court should consider all of these factors and, based on the totality of the circumstances, make a determination as to whether the activity was incident to service.

Pursuant to the above direction, the Court makes the following findings in this case:

1. At the time of the occurrence of this incident SSG Elliott was not on active duty— he was on leave. He was not under the compulsion of military orders and was not performing any military mission.

2. The incident occurred in his living quarters on the base.

3. He was engaged in a purely personal activity. He was watching television in his home while on leave when he was overcome by the carbon monoxide fumes. His wife was asleep at the time she was overcome by the fumes.

■ Based on the totality of the circumstances above described, the Court concludes that Sgt. Elliott's claims do not arise from activity incident to his military service because watching television in the member's home while on leave cannot be legitimately considered activity proximately related to military service, and the mere fact that the injuries were sustained in the member's

quarters on post cannot lead to a different conclusion.

Consistent with the foregoing, the Court concludes that Plaintiffs' claims are not barred by the *Feres* doctrine.

Having determined that this is clearly a case of liability on the part of the Defendant, the Court now turns to consideration of the damages sustained by the Plaintiffs.

In light of the evidence introduced and the stipulations entered into between the parties it is obvious that each Plaintiff suffered serious and potentially fatal injuries on the night of August 28 and the morning of August 29, 1989. They had both been exposed to carbon monoxide in high concentration. David Elliott had a carbon monoxide level of 51% and Barbara Elliott had a carbon monoxide level of 49%. They were both in critical condition because a carbon monoxide level above 25% means that the individual is at risk of death. They were both placed in intensive care, both being supported by mechanical ventilators and both being in a comatose state. Each of them suffered severe critical injury and was virtually on the threshold of death at the time of admission to the hospital.

Both of the Plaintiffs seek to recover damages for medical expenses, past, present, and future, for pain and suffering, physical and mental, past, present, and future, for loss of earning capacity, for permanent disability, for loss of consortium, and for the loss of enjoyment of life. Under Georgia law recovery may be had for each of these items. Loss of enjoyment of life is an element of damages which will be considered as a part of damages recoverable for pain and suffering.

The Court will deal with the respective claims of the respective Plaintiffs and make awards deemed by the Court to be appropriate.

## BARBARA ELLIOTT

### *Medical Expenses*

■ Barbara Elliott was hospitalized at Martin Army Hospital for approximately two and one-half weeks. She continued to require medical treatment after her release

from the hospital, including two out-patient surgeries to repair damage done to her throat. With regard to past medical expenses the parties have stipulated that her total medical expenses, not including Martin Army Hospital, were $4,808.95 of which there is an outstanding balance unpaid by the Government of $1,095.88.

She still suffers from headaches directly related to this injury and continues to have trouble with her throat and with breathing and has constant ringing in her ears which she has lived with since the day of this incident. Dr. Walter Skinner, who at one time was Chief of Psychology at Martin Army Hospital, testified as a Plaintiffs' witness and gave it as his opinion that Barbara Elliott has a 20% decreased cognitive ability as a result of her injury and will have need for future medical care. He states that she will require psychological counseling and treatment at least twice per month with an average expense of $100 per visit and that she would require this therapy for as long as their minor child is in the home and that after that point the therapy could possibly be reduced to once a month for the remainder of her life. He also gave it as his opinion that she may require a period of hospitalization during her lifetime, approximately every two, four, or six years, and that these hospitalizations generally cost about $1,000 a day and would last for a period between 15 and 28 days.

Plaintiffs' Exhibit 62 is a calculation with regard to Barbara Elliott's future medical expenses which indicates that the present value [2] of the future therapy needs for her is $128,139.55 and the present value projected on a four year cycle for hospitalizations is $324,227.54, and when these items of $1,095.88, $138,139.55, and $324,227.54 are added they come to a total medical expense of $463,462.97.

Testimony as to her needs for therapy and periodic hospitalization is unrebutted by the Defendant so the Court finds that Barbara Elliott should be and is hereby awarded $463,462.97 as compensation for past and future medical expenses.

*Pain and Suffering and Enjoyment of Life*

■ Barbara Elliott was in critical condition at the time of her admission to the hospital and was placed on a ventilator and was in intensive care for approximately four or five days. Thereafter she remained in the hospital for approximately two weeks. These situations cause tremendous stress, tension, and exhaustion on the patient.

Family members testified as to the emotional trauma which Barbara suffered throughout her hospitalization and up to the present time. Due to the nature and extent of her injuries and that of her husband, the testimony established that it has been necessary for a member of Barbara Elliotts' family to reside within the home since the day of the injury to help Barbara care for David while she is at work, and that for approximately two years the Elliotts have been living in a three bedroom home with Barbara Elliott's sister, Deloris Venson and her five children, all under the age of nine years. Financial constraints prohibit the Plaintiffs from being able to hire qualified individuals to provide the necessary care and treatment for David Elliott. Barbara Elliott testified in great detail as to her physical injuries, the continuing problems that she has with severe headaches which she did not experience prior to the incident, the problem with her throat, breathing, and the constant ringing in her ears which she has endured daily since the incident. In addition, Dr. Skinner testified that in his professional opinion Barbara is suffering from depression, he has great concern for Barbara doing an impulsive act, and if her condition is left untreated, that Barbara may well be a candidate for suicide. Barbara has expressed her fears to Dr. Skinner about leaving David alone, leaving him with their baby, her concerns that he would fall and hurt himself, that he could not get up and that he cannot take care of himself. Even the Defendant's expert, Dr. Kochno, testified as to the tremendous stress which the family will be under in the circumstances in which the Elliotts find themselves.

**2.** Wherever in this opinion it is necessary to reduce an amount to present value the Court has used a discount rate of 5% as provided by Section 51–12–13 of the Georgia Code.

In addition to the physical and mental pain and suffering, the Court heard substantial testimony dealing with the changes in Barbara Elliott's life, the changes in her personality and her loss of enjoyment of life which she has suffered as a direct result of this incident. Barbara Elliott very graphically described her daily routine and the pressures created by the fact that there is constantly some level of responsibility which she must bear in regard to the care she must give to her husband due to his injury, and thus she is without leisure time for relaxation. The Defendant offered no testimony in rebuttal to the testimony offered by the Plaintiffs in regard to pain and suffering and loss of enjoyment of life of Barbara Elliott. From all of this, the Court finds that Barbara Elliott has suffered substantial and significant mental and physical pain and suffering and has incurred a significant loss in the enjoyment of her life, and that those conditions will remain for the rest of her life. She was 25 years of age at the time of this injury so her life expectancy at that time was 54.29 years.

The Court awards Barbara Elliott as damages for pain and suffering, past, present, and future, and loss of enjoyment of life as an element of pain and suffering the sum of $1,000,000.00.

*Future Earning Capacity*

■ The testimony established that Barbara Elliott, who was 25 years of age at the time of this incident, was an honor graduate from high school, attended Lane College, and graduated *magna cum laude* with a BA degree in accounting and a Grade Point Average of 3.7. After working as a teacher's aide for a year in Columbus, she began an intern program with the government and started as a GS–7 and was guaranteed that within two years, provided she met minimum requirements, she would be a GS–11. As previously stated, Dr. Skinner established that Barbara had incurred a significant loss in cognitive function and, based upon her deficits, he would be concerned about her ability to continue in her occupation if she had to leave the job in which she is currently employed, since her supervisors have been so supportive and understanding about her injuries and have made numerous allowances therefor.

Her immediate supervisor, Merrit Ezekiel, testified that Barbara was working in the office when he arrived in March of 1989, and he has been her supervisor since that date. He described Barbara Elliott, prior to the incident, as always being punctual, reliable, and an employee he counted on to be there on a daily basis. He described her as energetic, outgoing, eager to help, and one who managed to deal with aggravating things quite well. In addition, he felt that she was in an upwardly mobile situation, with a good marriage, a good position in life, and always interested in trying new responsibilities at work. Ezekiel testified that since her injury he can no longer give her the type duties she had before, she is no longer interested in trying new things at work, and that the incident has affected her ability to work. He also testified that although she is now a GS–11 she is performing the work of a GS–6 or GS–7. Ezekiel described the government's new consolidation of accounting function which is going to eliminate many jobs and require people to either move or lose their jobs. Barbara Elliott testified that, prior to the accident, she had planned to return to college and get her MBA and hoped to become a CPA. She acknowledges that she cannot do her job as before and that she has concern over her ability to retain her present job. In addition, she is concerned about the reduction in force described by Mr. Ezekiel and her lack of seniority to keep her job should substantial changes be made.

Based upon the opinion of Dr. Skinner and the testimony of other witnesses, Dr. Michael Daniels, an economics expert, made a calculation in regard to Barbara Elliott's reduced earning capacity in the amount of 20%. Those calculations are reflected in Plaintiffs' Exhibit 61. Based upon those calculations Dr. Daniels gave the opinion that, using a 5% discount rate, the present cash value of Barbara's reduced earning capacity is $296,647.71. His testimony was entered without objection as was Plaintiffs' Exhibit 61. In response to this testimony, Dr. Seaman, testifying on behalf of the Defendant, stated he was not certain what the 20% disability rate

meant, but he was not disputing the assumptions which Dr. Daniels made. In addition, at a 5% discount rate, Dr. Seaman testified that the present value of 20% reduced earnings of Barbara Elliott would equal $224,568.00 and that the difference between his calculation and that of Dr. Daniels was due primarily to a lower work-life expectancy than that used by Dr. Daniels.

The Court finds that there is no doubt that Barbara Elliott's injuries have had an adverse impact on her future earning capacity and concludes that she has suffered a diminished capacity to earn money in the future and that the calculations of 20% reduction in this ability are fair and accurate. Therefore, the Court awards damages for lost future earning capacity in the amount of $296,647.71.

### Permanent Disability

■ In addition to the damages sought in regard to past and future medical expenses, pain and suffering and loss of enjoyment of life, and reduction in future earning capacity, Barbara Elliott also seeks damages for her permanent disability. Based upon the evidence presented, there is no question in the Court's mind that Barbara Elliott has in fact incurred permanent disability and the Court so finds. Dr. Lee testified that in the very early stages of Barbara Elliott's treatment, a psychologist was consulted at Martin Army Hospital and that the psychologist gave him the opinion that Barbara Elliott may well have some permanent cognitive defect. Dr. Lee described cognitive defects as such things as being able to perform calculations, to remember things, to be aware of surroundings and to respond in a quick manner to questions. The Court finds that this testimony is completely consistent with the eventual findings which Dr. Skinner made in his testing and calculations and which, in layman terms, the members of the family have described as to the change in Barbara Elliott's abilities and functions. In addition, Dr. Lee testified that up to the day of his trial testimony Barbara has throat problems as a result of her initial injury. Dr. Skinner testified that he had reviewed Barbara's high school records, all of her grades and other materials, and was aware that she was a college graduate with a degree in accounting and was aware of her grade point average and the awards she had won while in college. He felt that these additional facts confirmed his original opinion as to her intellectual level prior to the accident. In addition, Dr. Skinner testified that he had re-tested Barbara Elliott and was aware of testing done by Dr. Moyerman at Martin Army Hospital between the date of the injury and the date of his testing. In conclusion, Dr. Skinner testified that it was his opinion that Barbara had suffered a defect or loss in her cognitive functioning, most likely in the areas of decision making skills, ability to consolidate data, and to understand her own situation. In the mind of the Court, Dr. Skinner's opinions are confirmed by the testimony of Mr. Ezekiel, her supervisor, that Barbara did not appear to want to deal with difficult or complex problems, that he and other members of the staff were aware of and have compensated for her short comings, that she was not the employee that he had before, he did not believe that she would ever be that person again and that although she was considered as a GS–11, she was performing the work of a GS–6 or GS–7. In addition, Barbara Elliott has testified as to the problem of ringing in her ears that she had never had before the incident and which is always present. In addition, she described headaches in which the pain started over the left eye and which resulted in tightness and numbness setting in. She testified that she still has the headaches periodically.

Based upon the foregoing evidence, unrebutted by the Defendant, the Court finds that Barbara Elliott has incurred permanent disability, both mentally and physically, including, but not limited to, a 20% loss of cognitive function, for which she should be awarded the sum of $500,000.00.

### Loss of Consortium

■ Barbara Elliott describes in great detail the relationship which she and her husband had prior to the incident. She viewed them as being best friends as well as being husband and wife. It was obvious to the Court from her testimony, and the testimony of other family members, that it was a very close family, that the social life centered pri-

marily around the family, and that Barbara and David Elliott had an exceptional marriage prior to this incident. Before he was injured they exercised together, ran together, fixed meals together, enjoyed going out, going to the movies, and watching television. Since the incident the relationship has became "strained." Dr. Sweeney, although acknowledging that almost 80% of couples who find themselves in these or similar circumstances get divorced, testified that he found Barbara to be extremely supportive of David throughout the entire period of time he was hospitalized at Montgomery Rehabilitation Hospital. Sweeney also testified that it was very difficult for a family to adapt to this type of injury to a loved one, that the patients are unpredictable and need constant supervision and attention, and it is very stressful for whoever is looking after the individual. Dr. Waldrop testified that David's condition puts a tremendous strain on the marital relationship, that it changes the entire relationship and the entire family life. The fact that Barbara Elliott has remained with her husband indicates the strength of their marriage.

Barbara's relationship and marriage with David is much different now. She finds herself treating David like a child, that he has to be reminded, told, and directed, that he does not initiate anything, that he forgets a lot, and that there is not one minute of any day that she is awake that she does not have a feeling of responsibility for something. As will be discussed in more detail later, David Elliott is totally and permanently disabled and is leading a wheelchair-life.

From the foregoing facts the Court finds that Barbara Elliott has sustained a significant loss of the right to the consortium of her husband and that this loss is permanent and will continue for the length of her life or for the length of David's life, whichever ends first. David's life expectancy is 44.06 years from the date of the injury and Barbara's life expectancy is 54.29 from the date of the injury. For this loss of consortium the Court

awards Barbara Elliott the amount of $750,-000.00.

In summary of the above, the Court determines that Barbara Elliott should be and is hereby awarded the total sum of $3,010,-110.68 as compensation for her injuries and damages sustained.

## DAVID ELLIOTT

### Medical Expenses

It was stipulated during the course of the trial that David Elliott's total medical bills, not including the period of hospitalization at Martin Army Hospital, were $428,765.00. Of that, the Defendant has not paid $48,288.00. The parties agreed that if David Elliott is permitted to recover in this case that sum would be an item of David Elliott's damages.

All of the experts who have testified in this case for the Plaintiffs, Dr. Waldrop, Dr. Sweeney, and Lyn Munroe, and for the Defendant, Dr. Kochno and Mr. Miller, are in agreement that David Elliott is totally and permanently disabled, confined to a wheelchair, incontinent, has spastic quadriplegia secondary to anoxia of the brain with brain damage, and will never be employable in any kind of gainful employment, and will require extensive medical care for the rest of his life. His life expectancy at the time of this incident was 44.06 years. Other than the impact of a shorter life expectancy, as estimated by the Defendant's expert, and which the Court rejects,[3] the Court finds that the primary differences between the life care plan proposed by the Plaintiffs and that proposed by Defendant are the length of time in which therapies will be provided for David Elliott due to his injuries and disabilities resulting from this incident and the level of attendant care. Both parties agree that attendant care is necessary, and while there is some disagreement as to the number of hours per week, the primary disagreement centers on the level of qualifications of the attendant. The Defendant contends that it should somehow be entitled to a credit for those medical expenses which the VA *may* be

---

3. The Defendant's expert suggested that because David is a black male he should be accorded a shorter life expectancy than that which is projected by the standard mortality table which is customarily used.

willing to provide in the future. Without having to rule on the very legitimate issue of whether the Defendant has offered enough credible testimony to the Court to even authorize consideration of a credit for VA medical services, the Court finds that the Defendant is not entitled to such a speculative credit and declines to reduce those damages to which David Elliott is entitled by a speculative and unknown amount that the government "may" provide in the future.

With these general concepts in mind, the Court will determine future medical care which will be necessary and the proper method of assessing what those needs may be from the evidence adduced at trial. Having previously determined the issue of life expectancy and the appropriate discount rate, the Court will now consider the question of the level of attendant care. Dr. Sweeney, Dr. Waldrop, and Lyn Munroe testified extensively as to the fact that David Elliott will require assistance during the day and, to a reduced degree, supervision around the clock. Despite the fact that the plan proposed by the Plaintiffs did not provide for 24 hour care, Dr. Waldrop was particularly strong in this opinion that the care needed for David Elliott was 24 hour care. In addition, those three experts concurred that the attendant should be someone more than just a sitter, as contended by the Defendant. In the opinion of the Plaintiffs' experts, the attendant would need to be an able-bodied person, able to lift and move David and help him transfer, a person who could take blood pressure, pulse, and temperature, and one who has at least a working knowledge of fundamental medical procedures. Such a person is generally described as a medical assistant or someone who has worked with the disabled or in a rehabilitation hospital or nursing home. Dr. Waldrop describes this individual as someone like an orderly, a nurse, or an aide. He concurs that an R.N. or L.P.N. is not needed, but feels strongly that David needs more than just a sitter. Lyn Munroe testified that a person meeting the qualifications as defined by the experts for the Plaintiffs would cost between $6.00 and $9.00 per hour and an average cost of $7.50 per hour. On the issue of attendant care, the Defendant offered the testimony of Dr. Kochno and Mr. Miller and asked the Court to accept their testimony as a basis for the fact that less expensive attendant care would be adequate. The Court finds it pertinent that Dr. Kochno testified that his original life care plan did not include attendant care. Only after being deposed by Plaintiffs' counsel, did he determine that attendant care was needed. The Court also takes particular note of the fact that Mr. Miller testified that he would agree in most cases that the attending physician with a long term relationship with the patient probably has a better opportunity to observe and make recommendations concerning attendant care. The Court is well aware of the fact that Dr. Sweeney was David Elliott's primary treating physician for approximately ten months and has seen him periodically since that date and that Dr. Waldrop assumed responsibility for David Elliott in August, 1990, and has been his primary treating physician since that date. Although the Court does not take issue with the qualifications of Dr. Kochno, the Court is persuaded that Dr. Sweeney and Dr. Waldrop are in a better position to provide the Court more accurate information as to the level of attendant care which David Elliott will require in the future. Likewise, as to the issue of future therapies, the Court is persuaded that the necessary course of future therapies for David Elliott for the rest of his life is as recommended by his primary treating physicians and the Plaintiffs' experts.

Having resolved those two questions of fact, the Court now looks at the question of the appropriate life care plan. Since all of the medical doctors have agreed that David Elliott is in need of lifetime medical care and treatment, the Court must resolve the difference between the life care plan as proposed by Lyn Munroe based upon the medical information provided by the primary treating physicians, and the life care plan proposed by Mr. Miller based upon the three day evaluation done by Dr. Kochno and his review of medical records. Lyn Munroe has testified that, in addition to reviewing medical records, she visited Montgomery Rehabilitation Hospital for an extended period of time, met with Dr. Sweeney and his entire staff, including all therapists, met with the staff of the

Hughston Orthopaedic Clinic, and has visited David and Barbara Elliott in their home. In addition, Lyn Munroe testified that she had created several hundred life care plans as complex as David Elliott's life care plan in her career and, of great importance to the Court in its evaluation, that she has implemented numerous plans and was of the opinion that it was crucial for planning purposes to be experienced with implementing plans in order to make appropriate plans for persons in the future. Mr. Miller testified that he had been a private consultant in rehabilitation only since August, 1991, this was only the fifth plan that he had ever put together, and that he had never implemented a life care plan. Equally as important, Mr. Miller testified specifically that he agreed that Lyn Munroe's proposals as to David's needs in the future are correct. The Court further finds that in many ways the life care plan proposed by the Plaintiffs is conservative when compared to the needs outlined by the Plaintiffs' experts and treating physicians and, in fact, by the Defendant's experts. For that reason, the Court finds that the life care plan proposed by Lyn Munroe is reasonable, necessary, and is the more credible and more appropriate for the needs of the Plaintiff.

Dr. Michael Daniels was asked to evaluate the Munroe plan for the purpose of establishing the present cash value, using a discount rate of 5%. Dr. Seaman was asked to evaluate the same plan for the Defendant. Both economists used similar growth rates for medical expenses in the future and the differences are minimal. Dr. Daniels testified that the average between the minimum and the maximum costs as outlined by the life care plan developed by Lyn Munroe would be $3,797,452.00. Plaintiffs' Exhibit "60," introduced without objection, outlines the details of the evaluation of this plan from an economic viewpoint. Dr. Seaman finds the same plan at the same discount rate to have a value of $3,219,434.00, with the primary difference being the life expectancy difference previously dealt with by the Court. Therefore, the Court finds that the reasonable cost of future medical care for David Elliott is $3,797,452.00. When $48,765.00 is added this brings the total to $3,846,217.00, and the Court awards, for past and future medical expenses, that amount to David Elliott.

*Pain and Suffering and Enjoyment of Life*

The evidence established that David Elliott was comatose when he arrived at Martin Army Hospital and remained comatose or semi-comatose throughout his stay at Fort Benning. The record is full of extensive testimony related to the very difficult period of time that followed, for the weeks during which David was a patient at Martin Army Hospital and, subsequent to that, the ten months that he was a patient at Montgomery Rehabilitation Hospital. Mrs. Elliott testified that her husband was unable to communicate for two to three months after he arrived at Montgomery Rehabilitation. Dr. Sweeney described in great detail the progress David made and the very difficult time that he had in passing from the vegetative state that he was in at the time of arrival to the state of being able to walk with a walker on occasion and ambulate in a wheelchair at the time he was released to return to Columbus in August, 1990. In addition, Barbara Elliott has testified at length concerning David's difficulty in sleeping, of his incontinence, and the personal embarrassment he incurs in having to carry a urinal with him every time he leaves the home and not being able to control his bladder function. She also testified that he periodically loses control of his bowels, and both of these deficiencies are very embarrassing to him. Dr. Kochno testified that pain and suffering is a significant part of an injury of this type. He further testified that David Elliott may well progress to a severe depression which will interfere with his functional abilities. Dr. Sweeney testified that because of the loss of brain cells and the damage to his brain David will become senile much earlier than normal. He also described the severe problem that David had with incontinence of both bowel and bladder. He described the problem with incontinence being the most disquieting problem for patients and family and being the biggest barrier in getting the family back together. He related the problem as being the equivalent of having a grown person who has the same difficulties as a one or two year old child. He testified that David will deteri-

orate and that the aging process will accelerate considerably because of the spasticity on his left side, the ossification of the left hip, the fact that he has had heel cord lengthening procedures, and because his gait is ataxic. In addition, he will have stress on his joints that will lead to arthritis earlier than normal. Dr. Sweeney testified that in addition to the physical problems, David has an overlaying emotional and psychological problem that results from injuries of this nature. David has anxiety and there is a good possibility that this will develop into depression in the future because of his functional deficits. Dr. Sweeney concluded that because David is able to understand his limitations, the effect is that he will become more depressed.

In addition to this aspect of pain and suffering it is apparent to the Court that David Elliott has lost most, if not all, of his enjoyment of life. In addition to the vivid testimony of various witnesses in regard to the losses that David has suffered, the Court was shown graphically the level of injury that this Plaintiff has suffered. During the course of Dr. Waldrop's testimony David was brought into the courtroom in his wheelchair. After demonstrating a very limited ability to walk with a walker, Dr. Waldrop asked David to give up the walker and attempt to take a few steps. The time that elapsed between removal of the walker and his effort to take steps and the spastic effort which he exhibited dramatically depicted to the Court the level of loss that this Plaintiff has incurred.

David Elliott was a man who obviously enjoyed his family and enjoyed life. His primary diversions outside of his work place were to spend time with his family in various activities and to participate in numerous forms of athletics. He was an athlete in high school, having played on the varsity basketball team, was an avid runner, and he and his wife enjoyed running together as a part of their marital relationship. In addition, he had artistic abilities. He enjoyed his military career, was looking forward to retiring from that branch of service, and going into nursing for the remainder of his working life.

The David Elliott now before the Court, despite evidence of heroic efforts on his part to recover, is basically immobile, unable to

function, and severely afflicted. He is primarily confined to a wheelchair, and Dr. Kochno testified that he may become totally wheelchair dependent and that his primary form of mobility will be a wheelchair.

As did Barbara Elliott, other members of the family tell a story of a David Elliott who enjoyed life, enjoyed athletics and his family and, in particular, enjoyed reading. Now he remains in the house all day, mostly in the bedroom, watching television. He becomes very frustrated because he cannot do things with his small son and is only able to observe from his wheelchair. Other than family members, he has only one friend who visits him with any regularity. He is described as a man who does not talk much and gets emotional. He is also forgetful. His frustration is best described by Dr. Waldrop who testified that David could not save his child if the child were drowning or if a dog was attacking them. All of these deficiencies wear on David severely.

Dr. Sweeney summarized David by saying that there is a feeling of uselessness, not being able to provide for your family, not able to participate, being a burden to society and, more often than not, disabled patients become depressed because of this.

Based upon the evidence presented, which was virtually unrebutted and even supported by the testimony presented by the Defendant, the Court finds as a matter of fact that David Elliott has sustained very substantial mental and physical pain and suffering, will continue to endure such pain and suffering, that he has lost virtually all of the enjoyment of life, and that those conditions will remain for the rest of his natural life. The Court awards to David Elliott damages for pain and suffering, past, present, and future, and loss of enjoyment of life as an element of pain and suffering, the sum of $2,500,000.00.

*Future Earning Losses*

David Elliott completed high school, and after training in the military in various fields, settled on a medically related field, was an operating room technician, and was studying to obtain his LPN license. In essence he was functioning as an LPN at the time of his injury. He was 30 years of age at

the time of his injury. His goal was to be an LPN, to complete 20 years in military service, and then go into nursing in the civilian community on a full time basis. Every expert who has testified in this case, including Dr. Waldrop, Dr. Sweeney, Lyn Munroe, Dr. Kochno, and Mr. Miller, are in complete agreement that David Elliott is unemployable and will not be employable for the rest of his natural life.

The Court finds that because of his total and permanent disability David Elliott will not be employable for the rest of his natural life and notes that surprisingly the expert for the Plaintiff and the expert for the Defendant are only approximately $130,000.00 apart in their evaluation of his loss of future income. This difference is primarily due to life expectancy differences which the Court has previously resolved. Dr. Michael Daniels testified and an analysis which he made which is identified as Plaintiff's Exhibit 59 was introduced into evidence without objection and his testimony and this exhibit demonstrate, using a discount rate of 5%, that the present cash value of David's loss of future earnings is $1,629,650.00, and the Court adopts Dr. Daniels' analysis and finds that that is the appropriate measure of this loss. However, the Court also finds that the Defendant is entitled to a credit for the present cash value of the current monthly VA payments of $2,258.00 discounted at 5%. This present cash value is $507,428.00. When we deduct this amount from $1,629,-650.00 we have a balance of $1,122,222.00, and this is the amount which the Court awards to David Elliott for his loss of future income.

### Permanent Disability

■ Once again, all of the experts testifying in this case, whether they be experts called by the Plaintiffs or experts called by the Defendant, agree that David Elliott is totally and permanently disabled. From the initial evaluation at Martin Army Hospital, Dr. Lee determined and the medical team under his supervision made the assessment that David had suffered permanent brain damage. Dr. Waldrop testified that the improvement which David Elliott has made in the past two years is attributable primarily

to his motivation and that he was one of the most motivated patients that they had ever had in his lengthy tenure at the Hughston Clinic. He testified that David suffers from spastic quadriplegia and this is an absolutely permanent condition and that he is totally and permanently disabled. Lyn Munroe testified that she concurred with the physicians testifying in this case and that her opinion is that David Elliott is 100% permanently disabled. Likewise, Dr. Sweeney testified that David is totally and permanently disabled and that, in essence, you are dealing with a person who is at the level of a two to three year old child. Dr. Kochno testified that David is a very severely injured individual and he would classify his injury as catastrophic. He also testified that under his supervision the physical therapist did eight separate tests, and in five of those eight tests David's score was the equivalent of a four and a half year old child or less. In his opinion that is basically where David Elliott is at this point.

Based upon this overwhelming concurrence of testimony, the Court finds as a matter of fact that as a result of the carbon monoxide poisoning David Elliott is totally and permanently disabled. The Court further determines that he should be awarded an amount of $1,000,000.00 as compensation for this loss.

### Loss of Consortium

■ As a result of the injuries sustained by Barbara Elliott, his wife, David Elliott lost a significant marital relationship. Almost every aspect of his relationship with his wife is different from what it was prior to the incident on August 28, 1989. Due to her own injuries, her depression, and the stress of her life, Barbara Elliott is unable to perform many of the services she performed for her husband previously and many are now undertaken by family members. The overall relationship is more that of a parent/child than a husband/wife and this is due not only to David Elliott's injuries but also to the injuries to his wife, Barbara. Emotional stress and pressures of every day living on his wife have deprived him of the aid and companionship which was his right by virtue of the marriage relationship. Based upon all of the

evidence, the Court finds that as a result of the carbon monoxide poisoning of Barbara Elliott, David Elliott has sustained a significant loss of consortium with his wife as defined by Georgia law and that such loss will continue indefinitely. The Court awards damages to David Elliott for his loss of consortium, past, present, and future, in the amount of $500,000.00.

Consistent with the factual and legal determinations hereinabove made, judgment will be entered in favor of Barbara V. Elliott against the Defendant United States of America in the total amount of $3,010,110.68 and judgment will be entered in favor of Barbara V. Elliott, as Guardian of David E. Elliott, Jr., for the benefit of David E. Elliott, Jr., against the Defendant United States of America in the total amount of $8,968,439.00.

IT IS SO ORDERED.